May it please the court, my name is Ingrid Johnson from the law firm of Bagri, Drinker, Fiddle and Reef, and I represent the petitioner Jason Anthony Wright in this matter. Do you have this matter pro bono? Yes, I am pro bono counsel. I would like to reserve five minutes for rebuttal, please. Maybe you could help by just beginning with your understanding of what in the record establishes acquiescence on the part of the Jamaican government. So I think the record shows, if I could cite to some portions of the record, I think that would be helpful. For example, on the in the administrative record, page 308, it says that the police lack laws preventing mob, that the police state that the laws that are on the books do not prevent mob attacks on LGBT individuals. And it inhibits the fact that there are no laws, inhibits their ability to protect individuals. In the same article, it says Jamaican laws against loitering are used as pretext by police to detain men who do not conform to gender roles. And although those men are rarely prosecuted under the laws of Jamaica that prohibit homosexual acts, gay and bisexual men who are outed through arrest, risk of violence and other abuse by community members. By community members, tie that to the acquiescence on the part of the government. So the police use the loitering laws to harass gay and bisexual men. They then are arrested, and then they're outed to the public. So they are acquiescing, they are participating in the outing of gay and bisexual men, and these individuals will likely be persecuted by Jamaicans in general. Do the country reports note that, that it is typical for police departments to out gay and bisexual individuals? Yes. Well, through the loitering statutes. I mean, there's numerous ways that the government does acquiesce. So that's on Administrative Record 301, page... Is that a country report? It's a country report, yes. The same article says on Administrative Record 292, in spite of the procedures the government has put in place, it cannot protect against violence and discrimination. And under the standards set forth in Quinteros and Myrie, it is not whether or not they're making progress to protect individuals. The question is, can they protect individuals? And it's our position that that analysis never occurred below. It also says that police officers have failed to intervene when attacks are happening. That civil rights of gay men are not protected. Let me just pick up on this. I mean, there's a beta that says, you know, reports of generalized brutality don't suffice. I mean, so I mean, at one level, to seek redress under the convention, something, you know, just generalizations don't suffice, do they? I don't believe these are generalizations. Are they tied to this specific individual? No, they don't have to be tied. Well, talk to me about that mid-range, because at one level, they're written at a very broad level, but they aren't tied to this individual. So they aren't super specific. And you're also telling me that they aren't generalizations. So they seem to be following somewhere in the middle. Talk to me about that middle. Well, my client left Jamaica when he was 16 years old. So specifically, he doesn't have an adult history of being a gay man or a bisexual man in Jamaica. But what the country conditions show is that the actions of the government, either in failing to put laws in place that protect gay people against violence, in the police failing to protect individuals, the police actually outing people through harassment, all these things create the government acquiescence that we are arguing will subject him to torture. More likely than not torture? Isn't that the standard? Yes, it is more likely than not. How does this show that he would be subjected to more likely than not torture? And I guess the flip side of that is it's a substantial evidence standard. So what about the BIA's decision is deficient under that standard? Well, I think this, we are not here today, because this case is about whether or not, you're not deciding whether or not gay men in Jamaica are going to be more likely than not subjected to torture. The question here today is, when the BIA and the immigration judge reviewed the evidence, did they apply the proper standards? And the standard is that when you look at acquiescence, you have to, and this is the government, can protect the person. Now certainly I can't stand here today and give you, prognosticate, as we discussed in the previous argument, I can't say what will happen to my client. But the evidence below shows that there's a pervasive culture of treating gay men and women with violence, and that the police and the government, by failure to administer laws and control the violence. Is the information that you refer to, for example, in the country report AR-292, is that anecdotal? Is it that it's pervasive? Well, so what I find interesting is that what I'm citing to is exactly the report that the government cited to, or the agency cited to, in determining that there wasn't. But it is primarily their findings. Some of it's anecdotal, but I haven't pulled, you know, one off. But what you just cite from the government report, that there is people that the government, in effect, does not help, or cannot protect against violations. Yes. What does AR-292 exactly say? I'm sorry, AR- You quoted AR-292. AR-292 says, in spite of the government procedures that were cited in the agency's decision, it has so far failed to prevent and protect against violence and discrimination. Failed to punish perpetrators. So let me just follow up on that. Because I asked this question earlier about how much of this is specific and how much of this is general. And it strikes me that, at least as I hear it, a lot of this is very general. So let me ask you a question about scalability. Let's say we go with your argument. Let's say we agree with your argument. Wouldn't agreeing with your argument mean that every single bisexual male who was subject to removal to Jamaica would qualify for the convention? My argument is solely- Defer under the convention. My argument is solely on the record below. But the record below relies on these extraordinary generalizations, which are in the record and have to be weighed. But I guess my point is, if those to your client. I think that every person will need to show proofs. And so what proof has your client showed that it would be more likely than not that he would be tortured if he was removed? The evidence that we show is that there's this pervasive culture- So you see what I'm getting at? There's nothing unique to your client. It's a pervasive culture. Therefore, that pervasive culture, if used in every other case, would be basically an across-the-board rule, right? I'm looking, what is it that would be individualized to your client's situation? Not there's just this pervasive culture in Jamaica. And maybe the answer is, I don't need- your client doesn't need individualized proof. Maybe you say, look, the situation is so bad there that everyone who's similar to him qualifies for convention deferral. That's what I thought you were going to say. Yeah, I think, you know, if we knew that there was a country that said that everyone with blonde hair is going to be persecuted, and I didn't have any connection to that country and I was being sent there, under the Convention Against Torture, you can't do that. Because I have to prove that I have blonde hair. I have to prove that I can't- you know, all those things. I have to go through my proofs. But you can't just send me there. So if we go through the proofs from your client, it seems that your client is proving that he's a bisexual male and that Jamaica has, under some of those documents, pervasive hostility to bisexual men. It's a two-step proof, and with those two steps, the convention applies, if I understand your argument. Well, I think that it's going to change as Jamaica evolves. But that's your argument today. My argument today is that the BIA and the IJ, the immigration judge, should have adopted the analysis under MIRI, which requires them to not only consider whether there was government acquiescence, but whether or not the government could protect them. Could protect or would protect? Could protect. So if they could protect but wouldn't protect. That's the unwilling. She's talking about the unable. Right. Able to protect. Okay. And that there has been no analysis of that on these facts. I mean, if you look at the other server court cases on gay Jamaican men, I believe it was the You can't say that here. And the other case, they found that the individual was not credible. So, you know, we can't say that there's going to be a blanket rule from this case. Thank you. Thank you. Good morning, your honors. And it pleases the court. Imran Zaidi for the attorney general. Say name again. So I missed it. Imran Zaidi. Yes. To me, the one issue that this case comes down to, there was evidence put in primarily country reports. And the IJ here did a lengthy decision. But when it came to the country report says, okay, there are country reports. And then when it comes to the deferral of removal under cat, it's on pages one, two, three. A few paragraphs on the bottom of 12 and top of 13. And it doesn't appear that the IJ really gave a whole lot of consideration to the country reports. It says that reports of generalized brutality within a country do not necessarily show that a particular person would be in danger of being subjected to torture upon his or her return. Eligibility of cat deferral cannot be established by stringing together a series of suppositions to show that torture is more likely than not to occur. I'm not even quite sure what that means. If you do give that series of suppositions, why wouldn't that show in a particular person's case? So it isn't necessarily that Mr. Wright wins. It's just that I don't see the discussion by the IJ of the country reports and why they do not necessarily show future persecution in this case. Yes, Your Honor. So in future torture, I believe, is what you mean, cat deferral, right? So I think a couple points to respond to there. One is you cited a string of suppositions, the chain of evidence. That's for a matter of JFF. I think what the IJ was saying there, and this is commonly cited both by the board and by many courts, including this one, is that if you have a claim based on generalized evidence and that it's somewhat speculative because you're not presenting evidence specific to oneself, then you need to prove every piece, every link in the chain, and each link needs to be established by at least a likelihood of success, right? So here that link would be that there are individuals targeting this individual, that they would know that he is bisexual. But he hasn't been back. You can't say he's been individually targeted because he hasn't been back since he was, what, 16? That's exactly right, Your Honor. And that's exactly why and when the agency often cites this chain of evidence type of standard because the claim is based on generalized reports. And so, and I'm bringing this up in the context of your question. So if you were representing this person, what would you have to show to say that, wait a minute, I'm going back into a really nasty situation. I haven't been there in a long time, but it doesn't look good for me because of my sexual identity. That's right, Your Honor. What you would need to show is very difficult when you are relying only on generalized evidence, and that's sort of the center of the argument. As long as generalized evidence doesn't apply to him. It can't apply to him because he's never been there. Why are you referring to that as generalized evidence when the country reports are pretty specific about what the conditions are there for bisexual and homosexual men? No, Your Honor. So you can use generalized and specific in a lot of different ways. When we say generalized here, we mean not specific to a risk to himself. Of course, because he hasn't been there yet. Of course. And that's the government's point, Your Honor, to Judge McKee, that you don't have evidence that's specific to suggest that he himself has a risk of harm. I'm not sure where you're going with this. Does that mean that someone who's not been there but can come forward with all kinds of country report evidence to suggest the climate is so bad that it is incredibly unlikely that he will not be tortured? That it doesn't matter because it's not specific to him? I think that's close to what the government is saying. The government is not saying that because if the government is saying that, I've got a Dickens quote I want to throw at you. Well, you can throw the Dickens quote, Judge McKee, but the standard for protection under the Torture Convention is that you must show that you individually, straight from the regulations, that an individual, an applicant, he or she, faces a likelihood of torture by the government or with its acquiescence. But you've got to be able to show that based upon country conditions. Now, you can say it in general if you want to. Right. But if the country conditions are such that it establishes almost a mathematical certainty that anybody in a particular class of persons who is protected, well, not even protected class, because you don't get that with a cat, is going to be tortured, I'm not sure what you're saying about generalities. No, Your Honor. And you're, to be clear, in that hypothetical, and forget mathematical certainty, you're talking about just likelihood. But just likelihood, we're talking about 51 percent or more. And our point is the way case law comes out on this, from both the circuit and others, it is very difficult to show that you face a likelihood of torture. Set aside acquiescence for now. Just prospects of future harm. It is very difficult to show that you face a likelihood of torture based on background evidence alone. So we don't need to establish anything that was general versus specific. All we are saying is when you have not been to a country, so take that hypothetical, and it's not a hypothetical here, right. This individual left Jamaica 13 years ago at the age of 16. He does not allege that there's any harm, any threats of harm specific to him from Jamaica since that time, and has expressly disclaimed any reliance based on past experiences in Jamaica. They disclaimed that in their reply brief on page six. So they are very much alleging based purely on country reports. However general or specific, they're alleging based purely on those country reports and the general evidence in Jamaica that he faces a likelihood of torture. So let me follow up on Judge McKee's question. I'll give you two options. The first option is the country report says 100% of bisexual men face torture in Jamaica. Option two is the country report says amazingly we've got mathematical certainty and 40% of bisexual men face torture in Jamaica. Those are generalizations, but why don't you tell me would 100% suffice for convention deterrence first prong? We can talk acquiescence later, but would 100% work? I'm sorry. The two examples were one is 100% and the second one is just 40%. 40%. Okay. So if the country report says 100% of bisexual males face torture in Jamaica. Sure. That's good enough to at least get us down the road to acquiescence, right? If the agency reads that evidence and there's obviously going to be other country reports and they credit all that, absolutely. If it's 55% it is. So answer the 40% question. Sure. And 40%, looking at the math, would not be enough, but even 40% might be enough if then there is some additional evidence of that person specifically being targeted. So then isn't, so then, I mean, it seems that your opponent has this quite, it seems that to me her strongest point is that something is missing from the BIA's decision. And what seems to be missing from the BIA's decision is whether that country specific report is closer to 100% or closer to 40% or some other number. So doesn't the BIA have to kind of handicap that so that we can know? And if they don't consider that, then isn't that what remand is built on? No, Your Honor, and I think it's very important to separate out the two components of the CAT analysis here, both so acquiescence and then the likelihood of future harm. Both, to be very clear, are independent grounds for being disqualified from CAT, and that's exactly what the agency relied on here, that the petitioner satisfied neither one of those. I think generally speaking, the country reports can certainly speak to both of those. They can speak to your likelihood of facing future torture, and they can speak to whether or not the government might acquiesce in that torture. I think when you are relying solely on that evidence to establish both of those prongs, and especially I'm going to speak about the future, the likelihood of future harm, it is very difficult to get above that 50%, and to your specific point here, you usually simply don't see the agency or courts quantifying that. You see them taking the evidence, determining based on that evidence of country reports and articles about the conditions faced by here the LGBT community, and saying this is not a likelihood of future torture, and that's exactly what we have here. So I don't think it is a failure of the agency's analysis to not have quantified it using a number. So as long as the agency says we've looked at it, and it's not likely, that's good enough? Sure. I mean, and I don't think that is what the agency has said here, Your Honor. I think the agency took exactly what evidence was presented to it, and that's not just the lack of evidence that this person has been in the country, obviously he hasn't, nobody disputes that. It's also, and I think this is important when you get to the sufficiency of the agency's analysis point, there was not a single piece of evidence from the country reports argued in the brief before the board. They cited tab H, which was all of the country reports. And some component of the agency's analysis, how sufficient that is, is certainly, of course, tied to what arguments were put before it. There was a general claim that country reports are bad for Jamaica, but otherwise Petitioner relied on other things before the board. And that sort of standard for sufficiency of the agency's decision is when this court reviews it, is this court assured that the agency has thought and heard the evidence and not merely reacted? Well, when the evidence put before the board is simply that country conditions are bad, the board looks at that evidence, the board reviews all of it, and here to be very, very clear, the immigration judge specifically enumerated every single exhibit in the record, including the country conditions evidence. And when it did said, regardless of whether or not. It referred to it, but didn't really analyze it at all. I mean, the problem, when you look at J.A., I think it's 18, page, the last page of the court's, I.J.'s opinion. Ultimately, it says respondents claim requires the court to string together a series of suppositions that individuals are in fact searching for respondent, searching for right. We know that can't be because no one's searching for him at this time. He hasn't been there. He doesn't really exist. Two, that respondent will somehow be identified as bisexual, that he will be apprehended by the authorities, and that he will then be tortured by the Jamaican government. He has not, respondent has not demonstrated that each of the events in his hypothetical are more likely than not to take place. That can't be the series that we have here. I mean, it just doesn't make sense. It's not logical. He hasn't been there. Your Honor, that's right, and we believe that's part of the government's point, is that when you don't have someone who's been there and has some established basis for fearing future harm himself, then you rely only on country reports. So what you have to rely on are things like black country reports, which are pretty carefully done by the State Department. And so in that context, doesn't the I.J., as good as she is, and she's very careful normally, doesn't she have to deal with that? Absolutely. But again, to the point I was just making. Where does she actually deal with those country reports in this particular opinion? Well, Your Honor, on the last page that you mentioned, I was finishing my point about the evidence that she cited. She specifically mentioned, and this is an important point, an important point that this Court has relied on in green, which is listed all the evidence, took testimony, took documentary evidence, including country reports and articles, and then specifically said, whether or not listed in my decision, it is clear that I have considered all of this evidence. Now, directly to your point, to your question, Judge Ambrose, the immigration judge and the board both specifically mentioned various different points in the country reports that said that the Jamaican government has taken meaningful steps to reform with regard to its treatment of the LGBT community, including developing new policies to guide police response to violence against that community, to ensuring that reporting of crimes and violence towards that community are reported, and to intervening when such incidents occur. Now, that, we believe, is more than sufficient that both of those have cited that evidence, especially when considering, again, that the evidence that was put before it and the arguments that were put before the board were simply a site, generally, to all of the country conditions evidence. And the point I'm making right now is also consistent with how Petitioner has litigated this case from the beginning. There was a general reference to country conditions before the board without specifying anything in particular, and then the board rendered its decision. And then before the court, in Petitioner's opening brief, they cited several different excerpts from the record that suggest that conditions are bad for the LGBT community in Jamaica. And then in the reply brief, they unfurl more of the evidence. There's no question that that evidence exists. There's no question. And to be very clear about the government's position here, there is no question that conditions for the LGBT community in Jamaica are not good. But the question is whether the record supports the conclusion and compels it that the Jamaican government would acquiesce in Petitioner's future torture. We simply don't believe that that's the case here, and the record makes that clear. If there's no further questions, I ask that the court deny this petition for review. Thank you. Thank you. Counsel, Mr. Zady's last point was exactly why I started your argument with my question of you in terms of this acquiescence issue. That was one of the things that was concerning me, and I was hoping you would address that, and you did. I asked you about it, and you did address that. Okay. Well, if I could just pick up on or supplement that. The IJ, the very last part of her opinion, says although the country conditions report highlight various societal abuses against the LGBT community, the reports also suggest that Jamaican authorities have taken important steps to combat such abuse, including developing new policies to guide police response to violence against LGBT persons, making efforts to encourage reporting of crimes and intervening when the crimes occur. Moreover, reports submitted by respondents state that in general there is no real risk of state persecution as the authorities do not actively seek to prosecute LGBT persons. There is no real risk of prosecution even when the authorities become aware of such behavior. Therefore, he, that's a right, has not demonstrated government consent or acquiescence. I mean, what more can an IJ do with respect to acquiescence? That is cherry-picked from the very same report that I've cited several times in my argument. Okay, and what would you cherry-pick the other way? Pardon? What would you suggest from that report? Well, I think that the fact that they've attempted to make progress. You're saying from 292 that they're still failing? They're still failing, and they can't, under the Myrie and Quintero standard, they can't protect him. And that's what's lacking in the IJ's report and also in the BIA's report, is that there's no analysis of how she made the determination or the board made the determination that this was not, that he had not proved his case. I think that the government relies on case law, but I'm not clear what that case law is. It's very clear that the BIA and the immigration judge need to outline why they have rejected certain evidence, especially in the same report, and why they've come to that conclusion. I also have... Can I just pick up on that? I mean, the IJ's opinion, at least, the IJ's decision, at least, does account for country conditions, doesn't it? It says, although the country conditions reports highlight various societal abuses against the LGBT community, the reports also suggest that the Jamaican authorities have taken important steps to combat such abuse, and then list them. So, I mean, to the extent that you say that they should have reached a different conclusion based on that evidence, I get that, but I don't know that you have a point that says they didn't account for that evidence. Well, I think under Myrie and Quinteros, it says that you have to say why you reject evidence in favor of the petitioner or the applicant. And why isn't this good enough? Because she... They account for it, and then they say, you know, although it is, the reports also suggest these other points. And, I mean, maybe I guess you could say that the IJ's opinion is missing the phrase, you know, and because the reports suggest these other points, we therefore reject petitioner's point. But, I mean, that seems to be, you know, imposing a rule of grammar that I think may not be needed. But as I read this, it suggests that it was considered and it was rejected, and the reason for the rejected is in the second clause of the sentence. I think there's quite a bit of evidence in the record to the contrary. And not just that there are general country condition concerns, but to the contrary that the Jamaican government cannot, will not, whatever we decide may be, protect gay individuals. So if how we... And I think what Myrie says is that if you're going to reject that evidence, not... She... The IJ acknowledges certain evidence, but does not reject evidence that supports my client. And my client has, you know, there is strong evidence that needs to either be set forth in the record as to why it was not credible. So does Myrie basically put the IJ in a position of responding to like in civil discovery requests for admission? If there's, if someone serves like 40 requests for admission and the IJ only responds to 30, then there's a Myrie problem and it's either deemed admitted or we have to remand for the IJ to answer. It seems that you're reading Myrie as basically saying every single thing that could ever be favorable must be addressed specifically by the IJ. And the IJ, no matter how generalized that evidence is, cannot respond in a generalized fashion. I think Wang would tell me that I'm wrong, that that's not correct. What it will say, though, is if the judge decides that she has a piece of evidence that says this and she has a piece of evidence that says this, she has to say why she has rejected the favorable evidence. Does not have to go through everything. Wang is very clear on that, but you do have to say something as to why you've picked page whatever, 16 of the report to cite rather than page 29. Which supports my client, especially in a case where it's my client's life at risk. Doesn't this really come down to that the IJ attempted to do that and the only thing that you're suggesting that she missed is that she didn't add in, and oh, by the way, the government has failed so far? I think no. We haven't even gotten into how this opinion is essentially a rubber stamp of what the government wanted. And it basically took the government's oral argument. What else is there besides the government has failed to enforce its attempts to stop the persecution or torture of LGBT people? I apologize, but I left my notes. May I go get it? You don't have to call Uber for that, right? Just take two steps and you're there. I just said, yeah, go again. It's not a big deal. Thank you. So police officers failed to intervene. Prevalence of homophobic attitudes by the police force and police protection remains inadequate. That's 292. AR 342, civil rights are not properly protected and respected. Gay and bisexual Jamaicans are often denied access to protection under the law. So it's not... Why don't all those qualify as, quote, various social abuses against the LGBT community, quote? Isn't that a good description of that? That's what the IJ said, and that's what it sounds like you described. I don't see that. I see that as state action or inaction that has harmed a certain group of individuals. But if we go to that point, what Myrie and Quintero say is she's got to reject that and say, I don't find that credible. I don't find report X and such, X and such and X and such. The only thing I find credible is this piece of paper right here. But they didn't do that. So it really is like requests for admissions. They can't generalize and say various societal abuses against the LGBT community. They can't lump those all together. They have to go item by item and say whether or not they admit or deny. Well, based on the government's definition of generalized societal abuses, that to me is non-government action. Where does non-government action? Generalized societal abuses. I'm going to send another page. AR 372. The state has failed in its obligation to take appropriate measures to prevent violent attacks against LGBT individuals. And then the fact that, I'm going to go to AR 394 to 395. Arrest under the law criminalizing homosexual acts is not the primary concern. But they are used to justify violence toward LGBT people. So the laws themselves instill violence. So let me just ask this. If the phrase various societal abuses against the LGBT community instead read various societal abuses, comma, including those by the government, comma, against the LGBT community, then you would be satisfied that the IJ did a good job? I think that's better. But then the next part of that sentence is, and they're making progress. But my client is not going to be protected by progress. My client needs to go. If he's going to be sent home, we have to be confident that he is not more likely than not going to be subjected to torture. And the analysis is not there. Thank you. Your Honor.